Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. All right, Ms. Keaton, you may proceed. Good morning, may it please the court. I am Lori Keaton and I represent the City of Charlotte. We're here today on our appeal. Specifically, we have appealed the district court's award of approximately 1.6 million dollars to the plaintiffs and just to take a step back. In this case, the plaintiff has claimed race and sex discrimination by the Charlotte Mecklenburg Police Department. He was a patrol officer with CMPD from March of 98 to August of 2013 and in this case, the defendant's motion for summary judgment was denied as was our motion for directed verdict and for judgment on the pleading. The jury ultimately awarded the plaintiff $125,000 finding sex discrimination but not race discrimination and the court awarded approximately $1.6 million in front and back pay and then $330,000 in attorney fees and $22,000 in cost. We have filed our appeal in this matter and are here today because we believe that we are entitled to have our motion for judgment as a matter of law or for new trial granted on numerous grounds. I would briefly like to go through some pertinent facts before I get into the reasons why we believe we are entitled to have those motions granted. As you know and I said, it's the Title VII actions where the plaintiff was an African-American male police officer. CMPD is the law enforcement agency for the City of Charlotte and has numerous directives that the officers are expected to follow. The one that is most important for our is CMPD Directive 100-004. That is the directive that sets out the discipline philosophy for our police department. It sets out the factors to be considered in the application of our discipline. Those factors include employee motivation, the degree of harm caused by an officer's conduct, the employee's past record, and whether the errors they make are intentional or unintentional. The directive is explicit. The past record is taken into consideration to determine whether the failure to meet department expectations will be considered. If you continue to make errors, you can expect the consequences of your behavior to become progressively more punitive. In CMPD, we have three main disciplinary bodies, one of which is independent of CMPD. We have Internal Affairs, which plays a large role in this case. It's important to know that Internal Affairs is independent. The sergeants work exclusively for IA and they conduct our investigations. They do not select the cases which they are assigned. They play no role in determining discipline. They receive our complaints and they determine what charges and conduct investigations. They then produce a memo that summarizes the allegations, the rules implicated, and the factual findings. From there, it goes to the chain of command review board and IA's role is over. IA sergeants do not supervise anyone. The chain of command review board is made up of a sergeant, a lieutenant, a captain, and a major, and then a civilian representative. They take the findings of IA and then they make the decisions about discipline. The major is the ultimate decision maker. Finally, we have civil service boards, which are appointed by city council and the mayor. They make de novo reviews of any type of termination recommendation. With regards to Michael Tinsley, the plaintiff in this case, when he came to us in 1998, within a issue, which I have laid out in detail in my brief, as I think you can see, I will not spend time going through the details, but he had approximately 13 write-ups for partiness, failure to report issues, seven write-ups for investigatory issues, three for honesty, and one for insubordination, which was ultimately overruled by the chief. Amy, the keynote... This was, what, in the last century? That would be from 19... I'm sorry, your honor. Oh, I'm sorry. That would be his record from May of March of 1998 until April of 2013. Okay, when was the last time he was partied? Well, the last time he was partied would have been... That would have been in 2000. I can give you the exact date. I'm sorry. I think that was in 2011 was the last time that he was partied. Let me give you the exact date, but as set forth... Hang on one minute. When was he fired? He was fired in 2013, and I'm sorry, I'll tell you the exact date of the last time he was partied, but as I'm looking for that, the one thing I'll mention is the last time that he had an issue with partiness, I'm sorry, was 2012, but one thing I'd like to point out, your honor, is that going back to our discipline philosophy, the point of looking at these in this manner is to point out that, as you will recall, as I mentioned, it is progressive. And so the fact that we're seeing these repeated 13 write-ups for partiness and failure to report, seven for investigatory issues, would be very troubling under our discipline philosophy, if that makes sense. Well, I'm not sure it makes sense or not, but how many accommodations did he get since he's gone? He does have favorable reviews. As Ms. Sumter pointed out in her brief, he had gotten good favorable comments about particularly his patrolling of the skateboard area, the skateboarders in Uptown, so he did have some positives amongst this, but he had continual issues with discipline, and he also had other times that were not reflected in these where he was given, you know, oftentimes he'd be talked to and it would not be reflected as the trial transcript reflects. And so... Okay, but did you hear all of this, right? The jury did hear this, Your Honor. I agree with you on that point. Well, I think that, unfortunately... Unfortunately, what? Did the jury hear all of this? The jury did, but the piece of the puzzle that we're here to talk about... We're here to talk about what I'm asking you about. What I'm talking about is that the jury heard all of what you're talking about. The question is whether or not the fact that really was the reason, because you're going back... I had the pride of his good things he did, and you're going back to, what, 1989, you said he was pardoned, when you said Rathbone was 12, right? 1998, but the most recent ones, as you know, were actually going right up until the date of his termination. His last hearing was for things he had done in April of 2013, in the weeks leading up to his termination, so... Yes, Your Honor, I'm sorry. Well, what was his last evaluation? He received a good evaluation. Well, did all of those... When they evaluated, did they know what his record was back to 1989? I think that his super... Yes. Well, didn't they... Well, they would have that, but yet they said, present time, the last evaluation, he was performing well, that he was in good standing. It was all because of his incident with McKim, right? And the jury, looking to determine if that was the real reason he was pardoned, right? No, Your Honor. The question is, what is not? You don't think they concluded that? Respectfully, Your Honor, because the person who sat on the board, she gave testimony at trial. The board? I'm talking about the jury. The jury, we're not talking about the board. I think that the jury only heard about, I think, the issue, the jury, and what we're here about today is about the comparator issue. And so, I think the jury heard, the jury found there was discrimination here, but they were not given a comparator to compare him to. And so, I think that's the issue we're here about today, Your Honor, is, I think, the issue is that Amy Aquino... Wait a minute. Be careful. You're saying that's the issue, but the jury, they're the ones who look at the whole picture and try to find the truth. They're the ones who did the finding of facts. Now, you're saying that that fact is true, but they must have believed that that really wasn't the real reason that the comparator worked. There's the same activity involved. They had an affair, right? They did have a relationship. Right. They did. Correct. And did she accuse him of a crime? She did accuse him of rape. That is correct. And did you investigate that, whether or not that was true? It was investigated. Was the finding true or not? I think that what they ultimately found was all members found that it was true, except for the main chief found there was not enough evidence. So, he was not disciplined for the rape. Didn't the city pay money for a slander? The city paid. After he was terminated, she sued him, and the city paid because the city had forced her to be interviewed under the... Because she did not actually report the rape, someone else reported it, and she really did not want the rape reported. And so, the city went ahead and paid for it because they had put her in the position to be interviewed and forced her to do that. And so, the city made the determination that it was the right thing to do to pay for that, given they had put her in that position. That is correct. Chief, I don't mean to interrupt you. If you still have some further questions, I can wait. No, I do have further questions. You go ahead. All right. I would like to ask you about the comparator issue. And I just want to make sure I understand your argument. Your argument is a focused one. There's not a comparator. And I understand that what you're saying is that the records of the two individuals are simply not comparable, that Mr. Tinsley's performance record over the years was materially worse. And... But I thought that another argument that you were making with respect to whether there was a comparator or not had to do with the composition of the CCRB. As I understand it, the personnel and membership of the CCRB rotated. And so, what is your argument with respect to the rotation and how it bore on the comparator question and whether they actually had a... A single decision maker? Could you address the rotation on the CCRB? Sure. So, the CCRB, they would have never had the same... The way that the CCRB works is that there's never going to be the same five people. It's virtually impossible for there to be the same five people on the chain of command review board because the way they pick that, it's random and they pick people just based on their calendars. But it would be virtually impossible to have the same person on the chain of command review board. And so, they would never be having decisions made by the same chain of command review board. And so, that's important. It's also important to point out that Mr. Aquino and Mr. Tinsley did not have the same supervisor. So, that's another very important point to why they would not be proper comparators. And as this court is aware... For all five members on the CCRB, were they five different members for both Aquino and Tinsley? Yes. So, there is no evidence to support that they ever had any of the same members in their chain of command review board. Do you think that weighs against the presence of a comparator, that plus the difference in recommendations? I do think it weighs against it, as does the presence of the civil service board. I mean, the lack of a single decision maker in that sense. Although, the investigator was the same. One other question I had here was, I noticed that Mr. Tinsley ranks first of 118, I don't know whether this is correct, ranks first of 118 offices for arrests and traffic stops and the rest. And what I want to know is, what is your opinion of which way that cuts? If it's true, if it's correct, it could lead to the conclusion that this is somebody who's doing a fine job, but it could equally lead to the conclusion that it belongs in that 20% cohort of police officers that are overzealous and bad apples and too quick to use or misuse their authority. So, what significance do you attach? If any, that could make a difference in whether there's a similarity and a comparator. What is your thought about the significance that would attach to that? I think that it illustrates that Mr. Tinsley was a good officer. I think that what it supports is the fact that Mr. Tinsley, Officer Tinsley, was good at the things that he wanted to be good at or focused on, but I think that what his entire history from 1998 to 2013 reflects is that he struggled very much with anything that was not something he wanted to be focused on. So, that was kind of the one area, and there's testimony from numerous supervisors about this point. He enjoyed that area. It was something he liked to do. It was something he enjoyed, but when there were other things he was asked to do or told to do, he would not perform well, and he would tend to have, you know, issues. And so, I think it does show you that he could do well when he wanted to, but I think the other areas illustrate that he struggled in numerous other areas, and he was singularly focused on that area. Were all the arrests justified, or were some of them thrown out in court? There is no evidence of which I'm aware of that any of the arrests he made were problematic or thrown out in court. Okay. I wonder if you might… Ms. Keenan? Ms. Keenan, I think Jeff Keenan has a question. Go ahead, Jeff Keenan. Sorry. Yes, Your Honor. Thank you. And, Jeff Wilkinson, were you done? No, I'm fine. Before it's all through, I want to hear about the front pay award in particular. Okay. If I could just slip in here with one question. Sure. You're thinking Ms. Keenan and Ms. Sumter as well. What I'm concerned about in this case is you have the investigatory and disciplinary structure of the police department is such that it really doesn't fit into our Title VII first prudence. And so, what do we do with the like this when I think you have to say pretty clearly under our case law, there isn't a common supervisor. But surely, there must be a remedy under Title VII for somebody who has been the victim of discrimination. So, where do we go from here on that? Your Honor, I think in all of these, can a police officer never be subject to Title VII, excuse me, can a police department never be subject to Title VII liability or any other employer if they structure their disciplinary process and structure their review and decision process for retention in a way that there never is a common supervisor or a common decision maker and thereby attempts to avoid Title VII liability? How do we deal with this problem? And I certainly understand and I appreciate exactly your concern and your point. I think in this case, however, you know, we see that this isn't a situation where there could never be a Title VII claim. It's just in this particular case, we just happen to have two people who are so dissimilar, Mr. Kino and Mr. Tinsley, and the Charlotte-Mecklenburg Police Department has 13 divisions. So, we're talking about two officers in different divisions. Most, you know, they do not have the same supervisor. They do not have the same disciplinary type history. So, I don't think it's a situation where and I do agree with you that there are some, you know, we've seen cases where there are situations where you have, there's where you would never have a Title VII claim because the way the company is set up. I do not believe that the Charlotte-Mecklenburg Police Department is that type of entity, but I do just believe this is a particular case where there's such dissimilarity between the two parties that, you know, you wouldn't, you would not have, that they don't represent the proper parties to be compared towards. Because the very reason, oh, I'm sorry. Yeah, Ms. Tinsley, and I didn't mean to cut across you there. So, what I'm hearing you say is that before getting to the troubling issue of could anybody bring a Title VII claim against the Charlotte-Mecklenburg Police Department, I'm hearing you say that the records of the individuals involved show they're not comparative. Is that what you're saying today? That is what I'm saying today. I'm saying that I think that there is a Yeah, I'm sorry. And I understand that point. We've got to deal with it in our decision. But I don't think you've really given me an answer as to the second part. And I agree with you that Mr. Tinsley has a much longer disciplinary history than Ms. Aquino. But if we disagree with you on that point, in terms of whether they're comparable, let's just say we do. I'm not saying I would. Let's just say we do. Then we'll head on with the problem of no common supervisor, no common decision maker. And the situation we're under, how the city of Charlotte sets up a police department, it doesn't look like there ever will be. So how do we deal with that? Because I just feel we have to do something in this case to put a stamp of approval on a system that would never let anybody recover. Sure. And I think the cases in our circuit and the Fourth Circuit have talked about the need for flexibility, which I appreciate and understand for the very reason of what you're talking about, which is we cannot have a hard line where we say you've got to have the same supervisor, you've got to have, you know, we can't have these rigid rules. And I get and I think that those cases represent the very cases we need to have. And I would assume this case would fall into that same gamut where you all are going to have to look at the facts here. And you would not produce an opinion that says there's a black line, you know, hard line where it has to be these factors. But every case you have to weigh the variables because we cannot have a line that says you have to have the same supervisor, you have to have the same this, the same that, because I do understand and I think the prior cases and some of the cases that Ms. Humphrey talked about this very fact that you've got to have flexibility in this analysis. And so I would think that that is how we would is that we would say we're not going to have this be an inflexible requirement, because if we do, we could create situations where we allow companies and entities to avoid Title VII and that would not be the result that we would want to have. And so, whereas I think the structure as it's set up now, because you do have supervisors, you know, I think now you already have a structure at CMPD where we could be liable for Title VII as it currently exists. I understand the concern and the general proposition that you could have companies and entities that could avoid it. Okay. But there's no, there's no indication here that Charlotte had set up this particular structure to avoid Title VII liability. There are reasons for this type of structure and I think Judge Keenan's point is excellent. And I don't think you can attach this positive weight to it. It seems to me that it's one of a number of factors. But one thing, this kind of structure does have a certain number, have a certain number of advantages, because if you have the same people on the CCRB day in and day out, they become the most unpopular members of the force, or they become the most feared members of the force. And if it's always the same disciplinary panel, sometimes they exercise authority internally to a degree that they shouldn't. And also because these disciplinary matters are very disagreeable within any institution, whether it be an educational institution or an elected body or police force or anything. I mean, nobody really welcomes the idea of entertaining disciplinary complaints and making these disciplinary judgments over either fellow members of the force. And so what a lot of institutions do is they spread it around and they find that it's more equitable that way because they don't saddle one group of people with a permanent disagreeable role. So it has its purpose and it's a very legitimate one. But Judge Keenan's point is certainly a good one too. You don't want it to become a mechanism of avoidance. And I see that the only way out of this is to find out whether it's set up for legitimate reasons and also to simply emphasize the point that it is one of a number of factors and that it just can't be a dispositive one. And it certainly can't be a carte blanche to avoid Title VII liability, because that's not the kind of thing that anyone would want. It's a multifactored analysis and it's important, I think, that it be viewed in that perspective that it may be relevant or is relevant, but not dispositive. There's an awful lot of room for evidence that is relevant but not dispositive. And maybe that's the situation here for an instrument of institutional um governance that can make a certain amount of sense. Yeah. Counselor, Counselor, Ms. Keenan. Yes, Your Honor. When I asked the question, I didn't suggest, I mean, I said they haven't failed. I don't mean there's anything scandalous about it. They were consenting adults and neither one was married. I'm not talking about that. It wasn't a department policy for them to have a consensual relationship. It was not. Okay, it was not. Okay. Now, so we're talking about a comparison. Ms. Keenan makes a great point. But in this case here, it's in fact that the reason that we related to, the jury believed that the real reason that he was fired is based upon the relationship. Relationship. And not those things we talked about going back to being laid or things like that or what just, what was in common, taking a commendable thing. And I appreciate that you didn't suggest that having a good record in arrest might mean that they're being overzealous. Nothing indicates that our individual arrests are over chance. Thank you very much for that, Keenan. That's unbelievable. That's a great record of hurt you. But anyway, but the commonality in this case is really, I.A., the investigation. If the jury believed that really he really was, I'm not going to read it, but let's say hypothetically, and I'm going to say this, but I got a jury verdict on that guy. Let's say if the jury really believed that the reason he was fired was because of the relationship and both of them were in a relationship and she was not fired, he was, would you agree that that would be a comparison? I don't believe that she would be a comparator because I don't believe that, I still believe you've got the same problem. I don't believe just being in this relationship would be sufficient to make the two comparators respectfully. Well, why not? Because the investigator, although you have this board, it was the findings of the investigator as to whether or not it seemed like there was inconsistent answers given in an investigation, that ties in here. Unlike most cases where you have different, you don't have the same supervisor who would examine the same performance, understandably normal comparator. But here, if the jury believed that the real sine qua non of this case was the affair, and that's what led to determination, then you had the same investigator. As a matter of fact, you put one of the investigators interviewed with her in this case. I think it was 51 Aquino from 5-17-2017-2013 interview, which is interesting. You put that up in the record. But if they believe that that was the reason, because in Title VII, for example, most people don't go around saying, I have animals because you're black. I have animals because you're a woman, or because you're whatever. It's normally circumcised. And if the jury believed that she really was part of that reason, why would she not be a comparator? Because they both were investigated. But the difference is, so he had the additional thing happen with the church parking lot. But then I think we have to remember that ultimately, he goes before the chain of command hearing. They specifically say, and then you have the Civil Service Board hearing to terminate him, which is an independent body. And so I guess I'm just looking at this differently. I don't believe that's the reason. I guess that's just my opinion. But I don't think that was the terminated. So are you asking me if that's what the jury believed? Or are you asking me about the record? No, no, no. The record, it's enough for this record to believe that that's why he was fired. And the jury found it wasn't the judge who was there presiding, who heard the witnesses. Now, it's amazing how we can sometimes, you know, normally people shout, oh, it's a jury trial, and we have to refer them. But now when the jury comes back now, the reason that, well, it must have been something else. But there was enough evidence in this case that that was the triggering and the main reason. And the jury believed that it was. And the jury was very exacting. They said, no, this hasn't been doing very well. To be honest, this wasn't some runaway jury. They were very exact. You can tell, no, no evidence there. But there is evidence that a woman was treated differently than you. She wasn't fired. And I guess my issue is that I don't think the jury should have been given Amy Aquino as a proper comparator to start with. And I think that's where the issue lies, Your Honor, is that she should not have been presented to them as a comparator because she wasn't, because she didn't meet the qualifications to be the comparator to start with. And so, therefore, when she's put in that position to them as though, yes, this is who, you know, the judge unilaterally decided in his summary ruling, he unilaterally said, this is going to be the comparator for the case. She's the one and only comparator based on Burke as the common supervisor. I don't think that was the proper decision. And so then I think everything flows from that. I don't think that Burke as an I.A. sergeant who made no decisions and who had no, he had no ruling, no ability to make any decisions about Aquino or Hensley. So I think the jury was given an improper impression, for lack of a better word. They were not, that wasn't what should have been given to this jury. And that's what resulted in what we have here today. So I guess that's what I'm trying to convey, Your Honor. When I ask you, you go ahead, Chief. I'll hold my question until you're through. So, so, so basically you're saying the law is that you can totally inculcate yourself from any racial discrimination or sex discrimination, again, like with Jeff Keenan was able to because he said that there were tiers there, tiers in terms of who did what. But the common denominator was the infestigators. And no matter how much you put in, in terms of, for example, in this case, what difference does it make? Well, Chief, for example, the one thing that was not related to this was parking lot, right? He was fired because he was parked in a church parking lot, something like that? Uh, well, I mean, the civil service board said that they looked at his entire record all the way back to 98. But yes, in that latest, in the last hearing he had, they said that the thing that was added was the four charges from the, um, what they found on his phone from the, after they looked at both he and Aquino's phones, and they both got disciplined from what they found on their phones. And then they added the April 3rd, uh, parking lot incident. So yes, I mean, they both received discipline. So what did you add to her discipline? Well, she received 40 hours without pay as a result of what they found on her phone. And then he received four charges for what they found on his phone. And then an outside party submitted a complaint about something that happened on the parking lot. So those were the things that were going into that final chain of command hearing. And then they said that Major Lester said they all unanimously agreed with the termination decision. And just one final point I'd like to add is it's important to realize that the civil service board hearing where they voted to terminate him under that Simpson v. City of Tuscaloosa case, I would say that the role of the civil service board, arguably that that would break any causal link here between any sort of animus and determination. And, um, you know, because that is an independent board that is appointed by the mayor and they conducted the ANOVO hearing and they alone have the power to do the termination. So I would just like to mention that point as well to the panel. And his record, has he ever been disciplined before in terms of getting suspended? He had had, um, he had had suspensions. I mean, you know, their suspensions will be so many days and things like that. So he had had prior times where he'd been suspended for a number of, they do it in hours, but then it translates into days. Okay. So small and these type of records. So would he ever put on any kind of performance? Not that I'm aware of. No, I don't think he'd ever had like a specific where he'd been put on days. He had had comments made to him about things that he needed to, and you'll note that in the brief, I'd noted times where he had been told certain areas where he needed to work on and things like that. Um, but he had never specifically been, you know, he'd received three days suspension. He'd received counseling on certain areas and things like that. And then comments had been made to him specifically about areas where they were concerned. And those are specifically noted in the, in, in the record in memory, brother. I'm sorry. And then he was fired. He was fired because of the totality of the record, consistent with the discipline philosophy of CNPD. So they've looked at the entire record, according to the trial testimony, they took into account everything as they are supposed to. So they had everything in front of them, not just that they had everything. So what you're saying is he could have been made one more day and been fired because you look at everything he's done before. That would have been up to the civil service. That would have been up to the chain of command hearing. First of all, they would have had to look at it and then it would have gone to the civil service board to make a decision. So the chain of command hearing major Lester said that they looked at this, you know, they looked at the whole record over his career when they made their decision. And then the civil service board said they looked at the entire history and his entire record. And what they saw was a pattern of not following rules. That was the testimony from the civil service board. Yeah. Well, it's interesting. This is the law. It's amazing. Nobody's ever a perfect comparison. I mean, for example, you could say, you know, you're not hiring, you know, you fired 10 black people. You know, you haven't fired any white person. You know, well, none of them had the same thing. You know, they were late on Monday, you were late on Friday. So you're not a comparison. Or they had different reasons. I mean, you could play all kinds of games with Title VII. I think it's hard to say that Congress you know, I don't know about now, but in 1964, you know, things like that and looking at the statutes and civil rights that were thrown ahead. Now, in this instance here, basically, the way you were set up, he had no regrets. That's the law. These instances, if you have this flat out done, that is based on clear indications that there's a difference. It wouldn't make a difference if it's not a comparison. That can't be the law. Not in the fact of this case. But you're saying that's the law. You're saying that's the law. That's the result. I'm saying that under the existing law, my understanding of the existing law, which certainly I've realized under part of this panel, but I'm saying that based on the case laws that exist now, my understanding is it's important to have comparators for the reason that you need to establish an adequate comparator. And that would require that you have, you know, it's important to have adequate comparators. And if that requires, you have to be similar in all relevant respects. And that means if you have different decision makers, different, you know, different supervisors, you're seldom comparable to establish a prima facie case of discrimination. And so I'm not trying to suggest that the law is unduly harsh. I'm just looking at Haywood and that line of cases and trying to apply it here. And it would seem to me that under Mitchell v. Toledo Hospital, under all those cases, that what we have here is not a comparator. And so that is where I'm coming from. Haywood v. Locke, Mitchell, those cases, Your Honor. So I'm not trying to be unduly harsh. I just don't think it meets the standard for a existing law. Yeah, I appreciate it. Go ahead. I'm sorry. Ms. Keeton, thank you. This is Judge Keenan. And I want to ask you, to what extent are you relying on the findings of lack of candor against Officer Tinsley? I haven't heard you talk about that. Is that not a significant factor in your analysis? Yes. I mean, I just found some lack of candor and she wasn't. Is that something that we need to think about or not? I do think it's important, his lack of candor. He was found, as you noticed and noted in the record, that there was a problem about his lack of candor in the discussing the rape, even though he was not disciplined for the rape itself. There was a testimony at trial where it was said that he told three different stories about what happened on the night of the rape. So I think it is something that is important and that Chief Monroe later stated that, you know, that would be something that he would no longer be able to utilize, Mr. Officer Tinsley, in the same manner due to that finding. He would not be able to of the puzzle here. But in addition to everything else in the record, Chief Monroe did make that comment that that would have made him, you know, he would not be able to utilize him in the same way due to the finding of the lack of transparency. And so, yes, I do think that is, thank you for bringing that up. That is an important piece of the puzzle as well in all of this. And again, I think it goes to the fact that it goes to the whole record. And just one little, two seconds, I just want to add to that. That is brought up by Judge, that has been brought up before by Judge Mullen. And one thing he mentions is that Amy Aquino was not punished for her lack of candor. And this is an important point. There's been criticism of the fact that she was texting on during the 2 to 3 a.m. window when she was allegedly raped. And he took that to mean that she could not have been raped in that window. But I will just point out that obviously she could be raped between 2 and 3 a.m. in spite of the fact that she was texting for some small period of time during that window. So, it was an unusual thing to be put in a court order that someone could not, or their integrity was called into question because they claimed they were raped in a certain time period and they were texting during some small window. So, I just wanted to mention that because that was brought up about Ms. Aquino's integrity. So, but yes, I do think the integrity issue is relevant to the overall picture about the termination. Well, were they having a consensual relationship at the time? I'm not talking about the last time. I'm talking about during that time period. Were they? So, yes. They had an on-again, off-again, I don't know the exact word, relationship would be and at this particular occasion, it was the time when she, her testimony was that she refused it on this occasion. So, and it was an on and off again situation. And because they believed that he was telling, he wasn't telling the truth, then he was determined to be no longer a police officer because of that incident. So, it was a big part of it. I think a part of it had to do with the fact that there were inconsistencies between, you know, the different times he was interviewed. There were some differences in what he said about what occurred and so that was concerning. And then, so that there was concern about that. Well, at the hearing, Kinsley testified and this was for the first time that Officer Aquino said, stop. Yeah. And his view of the rape has just gone all over the place because at first he said it was consensual and then, no, at the hearing he said, no, she told me to stop. And that's, this is the difficulty that I'm having with the comparator and it doesn't just focus on the of a single decision maker. That's a part of it, to be sure, but it can't be dispositive. But when you combine that with the difference in the records, the cumulative nature of the story as to the rape, at a certain point in time, it begins to pile up and make you question, well, are these people really comparable? Are they really similar? They seem to, because a lot of the issues that are noted with respect to Mr. Kinsley are not noted with respect to Aquino. I don't think either one of these individuals is without a blemish. They're not, you know, they're not ideal officers in my view of the record. But for a variety of reasons, I just, I just, I have my doubts that, some real doubts that they are comparable. And they're, they're not, the doubts seem to be based on undisputed evidence. I guess that's the gist of what you're saying to us, isn't it? Yes, Your Honor. All right. Well, I know I'm way past my time, so I was just stopping. I don't know if you all want me to finish or what you want me to do. All right. I don't hear any more questions. All right. Ms. Sumter? Good afternoon, Your Honor. I'm sorry. Go ahead. No, no, go ahead. I'm Geraldine Sumter. I represent Michael Kinsley, and I have listened to your questions attentively and would like to have an opportunity to respond to your questions as I make my argument. In this appeal, the defendant has the burden of showing that the judge denied their motion for judgment as a matter of law based on the fact that there was no comparable evidence. And on its motion for a new trial, this court reviews the district court denial of the motion for a new trial on a clear abuse of discretion. What we have in this case are two employees who allege inappropriate behavior by a coworker. One was the female, Amy Aquino. The other was the difference lead by IA and by the department. In order for you to understand why we say Amy Aquino is a comparator, I need to walk you through the facts related to the discipline philosophy. And I want to tell you that as the court said in Bostick versus Clayton County, it does not matter what the employer's name or its policies are. What matters is how it applies to policy. And so as far as Mr. Kinsley is concerned, they can call their disciplinary policy anything they want. They can have whatever factors they want to be considered in the that is the problem with this case. So all of your questions and concerns about whether a policy such as this automatically prevents Title VII application might be for another case, not this one. In this case, the evidence presented to the jury showed that there is no way that there would ever be a sane supervisor in the cases and the violations which are brought before this court. The defendant's policy clearly says that in disciplining employees, there are certain violations for supervisors are responsible and certain for which the internal affairs department is responsible. The issues in this case are only handled by internal affairs. Now, under the defendant's policy and its own witnesses testified to this, that once IA receives a complaint or information about a rule violation, it is IA which decides what, if any, charges could be brought against the employee. It then builds a case if they find that there is a fair probability of a violation. At all times relevant here, the internal affairs investigation, I'm sorry, the internal affairs partner consisted of Sergeant Burke, Captain Maglione, and Major Stelzner as it relates to the actions which occurred in 2013. And I will tell you that the record shows that before these incidents occurred in 2013, Mr. Kinsley was not in jeopardy of losing his job. The internal affairs officers spoke among themselves about cases. They reviewed each other's work. And the major had the responsibility of having discussions with Chief Monroe about what was happening in the investigation. So, this notion that the internal affairs investigation is independent is not true. And the record, the testimony in this case proved that it was not true and the jury accepted that. In fact, when the IA completes its investigation and determines that a violation of certain rules have occurred, they don't make a decision about punishment, but they send those recommendations to the chain of command board. The internal affairs officers, all of them in the chain who have anything to do with that major, sit in on the command review board throughout the entire process, including its deliberation. Now, the client is not allowed to sit in on the deliberations. The client is excused. In the present chain, it would be IA which initiates the action and for all intents and to a supervisor taking action. But even if you did not decide that IA's action constituted the initiation of the process, which I think would be very difficult to do given the records in this case, the evidence shows that Chief Monroe in an unprecedented move appeared before the civil service board, which is that board of people appointed by the mayor and the county. And just for the record, in the city of Charlotte, police officers and fire department employees can only be hired and fired by the civil service board. So the chief of police makes recommendations to the civil service board. And on paper, the civil service board appears to be independent. Undisputed evidence in this case is that it is not. The plaintiff called retired Major Norman Gard to the scene. He testified that he sat on the civil service board for a full term and had been scheduled to do another term. But he quit, he said, because I cannot stand the way that the police department was dealing with the different type cases. He specifically pointed out a case where he thought the civil service board and the chief of police worked together. His example of that was that the city had a rule that if an officer failed or rather tested positively for drugs, that he must be fired. That's a black and white rule. The board was prepared to discharge him, but the chief of police told the civil service board to violate a common tenet and rule that says that a police officer who tests positive for drugs must be fired. He convinced Sumter, excuse me Ms. Sumter, this is Judge Kenan, what does that have to do with this case? What it has to do with this case is that the quote, independence of the civil service board was brought into question by that testimony. And it was testimony upon which a jury could determine that that decision was not independent. That the decision was made. Okay, let me correct you. Yeah. Could I follow up my question if I could? Yeah. And I apologize, I didn't mean to cut across your phone call with any kind of video or telephone. No problem. But in any event, it seems to me that what we've really got to look at here is that we have on one side, Mr. Kinsley, who had 29 disciplinary violations over a 20 plus year period, plus a finding of lack of candor in the rape investigation. We have Aquino, who only had a three plus year history with three incidents of discipline and no finding of lack of candor in terms of the police department findings. So can we say that those are adequate comparators based on the factual record? That's really what I'm grappling with here. I'm totally sympathetic to the fact that the police department is so structured, it's hard to make a case. But these facts seem to show a very dissimilar record between the two. So help me with that. First of all, Your Honor, you are wrong in your count of disciplinary actions taken against Aquino. There are more and they're set out in my brief on page 19. I think you are also incorrect in the number of disciplinary actions that you say are taken against Mr. Kinsley. The records will show what they are. But if your question is, because Aquino did not have a record in this police department, similar to Mr. Kinsley, then she must not be a comparator. That is not the Yes, I don't take I'm not. I hope you are taking my response to do that. Yeah, I'm trying to figure out how we decide this case fairly to both parties. In the case. And so that's why. And I'll go ahead and count. You know, I've got my list here. And you know, perhaps the list is incorrect. But in terms of the actual numbers involved, but there is a very marked dissimilarity in the number of incidents of discipline. And so how do we deal? How do we deal with that in the analysis? That's all I'm asking. All right, so this is how you deal with it in the analysis. I asked you to consider other evidence of behavior by Aquino, which was never investigated. Which, if it had been, would greatly increase the number of disciplinary actions that she should have received. Now, what happened, first of all, is there was a relationship between them. She wanted more of the relationship than he did. And when he told her no, she engaged in that behavior repeatedly. Stalking of a citizen, of another person, especially while she is on duty, and sometimes leaving her division, amounts to rule violation, including a criminal charge. I.A. was made aware of that and work admitted in his trial testimony that Tinsley told him about this before any of her allegations of rape. And so what you have is Mr. Tinsley going to the department and telling them about things that Amy Aquino was doing to him. And they basically took an attitude that he was a man and therefore a woman couldn't be intimidating to him. She then skirts on the issue of whether she should have been disciplined for stalking. I.A. had the ability to initiate charges. And in fact, for the number of complaints that Mr. Tinsley made to Burke and others, under their own policy, a charge should have been initiated. No such charge was done. Further, Aquino was cautioned by Mr. Tinsley's supervisor not to show up at Mr. Tinsley's workplace after he caught her there on two occasions. She continued. He then reported her to her supervisor. And as it turns out, the record shows that her supervisor, and this was in May of 2013. In January of 2013, her supervisor had gotten reports from some of Amy Aquino's co-workers that she was not appearing at calls because she was out of the division. Okay. Only in May after Sarsaparilla makes a complaint, does she- Right there. Excuse me, counsel. Isn't it fair to say as well that there were complaints against Tinsley that were even never investigated, never charged, or whatever? I mean, they were never- The rape was never criminally charged, but it was pretty questionable behavior to say the very least. I'm just going along, what's the record? Because there could be all kinds of things as background as to when the two of them were in an affair, and when they were not in an affair, and when the relationship was consensual, and when it was not. And there's not all of these accusations and counter accusations surrounding their relationship, but what was actually reported and documented in the disciplinary records. And when you focus on that, which seems to be the most relevant thing, there is a disparity. And it's not just a small disparity. That's one of the difficulties that I'm having here because there's a lot of background here, and there's a lot of, the way there always is, there's a great deal of acrimony when relationships are on and off again, and when they break off, they're surrounded, I guess, by revenge in some ways, and they're always mutual recriminations about this and that. But if you focus on the record, there seems to be a real difference. That's the problem I'm having. Okay, Your Honor, I think that you have to... And I grant you the point that the record here for opposite Tinsley covers a longer period of time. And so I'm well aware of that, but the period of time that Aquino covered was not a short period of time. And even granting that there's a longer period of time for one, the disparity still persists. And one of the things that is concerning about the disparity here is that many of the violations are repetitive. And your opposing counsel said, well, he was good at what he wanted to be good at, and he was indifferent on that, he was good at what he didn't want to be good at. But the problem is that the infractions tend to indicate that he may not have been concerned with making his behavior more constructive as when he cited for failure to show up for duty, failure to show up eight different times, failing to notify a supervisor seven different times. And then there are a number of others which indicate a kind of a negligent or maybe a bit of a nonchalant attitude toward importance of the job. But you don't get that same sense of repetitiveness in the record as far as Ms. Aquino is concerned. So it's not just the number of infractions, it's the nature of the infractions and the repetitive nature of the infractions that give me some cause for pause. You see what I'm saying? Well, Your Honor, if I may, I'd like to address your concern. First, I think that you cannot claim that, not you personally, but it cannot be claimed that Amy Aquino and Mr. Tindley are not comparators simply because the department responsible for initiating charges of wrongdoing decided that it would not initiate those charges against Aquino. And what I was telling you wasn't some tit-for-tat behavior between Mr. Tindley and Ms. Aquino. It was all one-sided. He was not at her places of recreation and stalking her. She was. And he complained so much about that, nothing was done. So he went down to Mecklenburg County Courthouse and filed a domestic violence protective order against her. The city of Charlotte hired an attorney to go down and represent Aquino on that charge. And they worked out a settlement agreement where she agreed to cease some of her behavior. Now, I believe that that conduct, the conduct which gave rise to the need for a domestic violence protective order, is certainly the kind of conduct which constitutes numerous rule violations, but never saw IA initiate any such rule violation. So when I say to you that the Internal Affairs Office did not treat the pleas and cries of Mr. Tindley the same that it did a female who we strenuously contend lied when she alleged that he had raped her on April 2nd, she did not bring the charge until May 7th, which was the same day that she got a write-off. She went and told a co-worker that she had been raped. That co-worker was bound to report that, and he did make a report. And it was her report that the rape occurred on April 2nd between 2 and 3 o'clock. And Judge, you talk about a short texting period. It wasn't a text. It was a telephone conversation for more than 21 minutes. And then another, say in 20 minutes later, another phone call to the same man. The jury heard that evidence and decided that she would be treated better and differently than Mr. Tindley. And not only that, Your Honor, but this patrol officer, this sworn officer, made it her business to not only harass Mr. Tindley, but to harass women with whom he had previously had relationships. She did that by following them. Mr. Tindley reported it because the women called him in complaint. She did that by calling one of them and threatening and saying to her, I know where you live, and I know where your children go to school. That was reported to the Internal Affairs Division, and no investigation was started. In addition, she ran reports on driver's licenses and automobile tags on women with whom he had previously had a relationship. That too was reported to Internal Affairs, and they did nothing to address that behavior. So there were things that piled up, behavior that piled up. And I am saying to you that if the Internal Affairs had treated Mr. Tindley's complaint with the same care that they had treated Amy Aquino's, she would have a much longer, more serious, more serious record of discipline. This is why I say the Internal Affairs is at the core of this. And, Your Honor, she displayed lack of candor and truthfulness issues not only on the rape, but she also demonstrated that... Mr. Sumter, may I ask a question? One thing I'm wondering is a lot of what you're saying has to do with their private relationship and the fact that they are obviously in a very tangled relationship, and it's difficult to sort out. But I'm wondering what bearing their private acrimony has on the police department and the records of discipline. And that may have those kinds of quarrels, sometimes best settled with a protective order, sometimes they're best settled in a divorce court, sometimes they're best settled in a slander suit. But where the disparity lies are not in their private acrimony and recrimination, but in their professional behavior, which it would seem to be the chief concern of the police department. All of these infractions that are documented in the record have to do with behavior on the job and the way in which the police department interacts with the public, or the way in which tardiness for work and the like makes the department's mission and functioning more difficult. And it seems to me that a lot of what you're talking about is private behavior, which doesn't impact relationships with suspects or victims or internal employment, punctuality, and absenteeism. And I don't know how to sort through who's raping whom and who's stalking whom. I don't know. I do know one thing about the rape, and that is the alleged rape, and that is that the testimony about it was very inconsistent. And that would take it out of the realm of the private, purely private. If you say on the one hand that it was consensual and then you get in a hearing and say, no, she told me to stop, that would take it out of the private realm and actually reflect on somebody's veracity. And you say, well, that person's word may not be trustworthy. And of course, you want police officers testifying in court who are trustworthy. And as I understand it, the result of all of this, he was going to be slated for desk duty. But so much of this seems to me, he said, she said, sort of very messy, sticky, private situation. And shouldn't we just be focusing really here on professional misconduct and professional behavior? Because messy situations often take place off hours. And there are a whole lot of people whose professional conduct may be exemplary or may be deplorable. But we try to draw a certain line between the personal, people's private business and their performance on the job. I'm trying to struggle with this case too. And I just want to some of the problems I'm having. Thank you, Your Honor. I'd like to address first, all of the things that I just mentioned to you that Ms. Aquino did were done, filed, she was in uniform and on the clock. So one of the things that she did was she showed up at the workplace of a woman that Mr. Kinsley knew in her uniform and stood and watched her. And then ran her tag. That was all during the course of her work and on the clock. All of that was unprofessional. And that was directed not at Mr. Kinsley, but at other people. That's not a personal vendetta or a personal argument between Mr. Kinsley and Ms. Aquino. And I don't doubt, Your Honor, the record is not clear on this, but I don't doubt that there were times, no, the record is clear on this. It's undisputed. And Mr. Kinsley testified that there were times that he and Ms. Aquino did not keep eye to eye on where their relationship should go. That's not an issue in this case. That's not the issue in this case. And if not, Your Honor, what fits in fact they may have between themselves, what is at question here is how the department addresses complaints brought to it or whenever they find out that there is a potential rule violation. That's what we're going to do. Ms. Sumpter, this is Judge Keenan. It sounds like where your head has been is to say to us that as a matter of law, a reviewing court must consider uncharged conduct as well as determining whether somebody is an adequate comparative. Can you point to any of our precedents that has such a discussion of uncharged conduct versus charged conduct? Well, Your Honor, I believe every case that you have where, well, I can't do it in the context of an internal affairs or police department, but I believe every Title VII case where a and someone outside of the protected class was not disciplined for the same thing would address that. That's hilarious. I think because what you're saying, and again, I'm not being adversarial. I'm just trying to understand this. You're saying that uncharged conduct of a different nature must be considered as well as charged conduct of a different and similar nature. To what extent does the law require us to consider uncharged conduct of a different nature? In other words, stuff that she was doing on the job, stalking his girlfriends that was not implicated in any way in terms of their one of them. Is it relevant? I'm curious on your take on that. I appreciate your question, Your Honor. If the defendant maintains that it looks at the cumulative records when assessing discipline, and if the defendant is saying that Amy Aquino is not a comparator because her disciplinary record is not equal to or similar in material respects to Mr. Tinbury, if there's evidence in the record that she engaged in conduct which would them, then that is a difference in treatment. That's what I'm talking about when I say this case is about how the defendant administers its policy. If IA has the discretion to shove things under the rug for some people but not for others, then I believe that that conduct is evidence of anima. Because the chief of police, when he makes the ultimate recommendation to the civil service board, has no personal knowledge, has not done the investigations, he says he's only relying upon the information which comes to him. If IA is selected to be a comparator in what it charges and who it charges, then that becomes a question for the jury on whether the comparators are similar. That's the case law. Whether the comparators are similar is a question of fact. And the evidence was submitted, and the jury found that she was similar. And not only, Your Honor, if I could address a part of your question and a part of Judge Locuston's question, in addition to those things that I told you Akima did not get charged for, there was this slander trial that Mr. Tinsley initiated. Now, the city, if this were purely private, Judge Locuston, the city would not have a basis for hiring a lawyer to defend her and for paying the judgment that was rendered against her. She was sued only in her individual capacity for her slander with respect to the allegation of rape. But the city defended that action, even though itself had not come to the conclusion that a rape had occurred. And no criminal investigation was started, but they didn't even bring criminal charges against her. So, when we look at a police officer who, in her personal capacity, is sued, but the city supports her with an attorney and then pays the settlement, but never charges her with truthfulness violation after a jury has found her to have slandered. Is Akima still permitted to testify in court? I beg your pardon, Your Honor? Is Akima still permitted to testify in court? Not at this time, but if I may lay the facts out for you on that, Your Honor. All I'm saying is that wasn't something that they just overlooked. No, Your Honor. Please, let me explain to you. In 2014, the complaint for slander was filed. In 2016, the trial was held. The department claimed that it supported her with a lawyer and paying the settlement because they said they required her to testify. I want the court to understand that that is incorrect as a matter of record. In the trial transcript of the testimony of Captain Rosalyn Maglione, I asked her on court examination whether Akima was required to give information in a criminal investigation, and her response was she was asked to give She said, I didn't have anything to do with the criminal investigation, so I don't know. And then my question was, but is the person ever required to participate in a criminal investigation? And her answer was, no, they are not. So even with the city acknowledging in her testimony that the reason that they proffer for giving this woman a lawyer and paying the settlement is contradicted by the IA captain, the jury heard all of that and could easily conclude that there was a difference in treatment. So the verdict came out in 2016. Clearly, IA and the chief of police knew that verdict came out in 2016. The procedure is that when an officer has a truthfulness violation or some behavior which impugns their credibility, the information is to be shared with the district attorney so that the district attorney can meet its Gidleo obligations. That was not done in 2016. Only in November of 2018, or in the fall of 2018, did the district attorney gain knowledge that a jury had determined that she slandered Mr. Kinsey. November 2018, he wrote a letter to Chief Putney saying to him then that he could not call Amy Aquino to the stand because her credibility was jeopardized. He noted that she had already had one allegation of false testimony, which created some problems for her. But in this letter dated November 26, found on page 1371 of the record, he says, nevertheless, this fall, I was informed that a Mecklenburg County jury found Aquino liable to slander in 2015, and the city of Charlotte paid $41,500 to resolve the claim. In light of this new finding, I have concluded that the Mecklenburg County district attorney's office will no longer be able to call Officer Aquino as a police witness for the state of North Carolina in any criminal or traffic case. Amy Aquino. Yes, Amy Aquino. That's not the full answer, Your Honor. But that's not the complete answer. The complete answer is that when we tried this case in March of 2019, the undisputed testimony was that Amy Aquino was still in the department as a patrol officer. So the chief of police shows up at the civil service board and beats the drum of integrity and truthfulness and Mr. Kinsley being of no use to the department. Even if the civil service board had told him that he needed to be reinstated, he said he would make him a clerk. Mr. Kinsley has never worked as a clerk, and so reinstating him to a clerk would be defying his right to reinstatement if the civil service board had done that. Now, I ask you to consider the undisputed evidence of Mace Barnes about the relationship between the chief of police and the civil service board and how they've been to the chief's wishes to understand why the jury could conclude that all of this going on about truthfulness is really undercut by what this department did with Amy Aquino. These are all professional issues, Judge Wilkerson. That's not a personal issue. That's all a professional issue. And he claimed that truthfulness was really critical, but the record, and I set them out in our brief, shows that there were a number of other officers who had truthfulness violations or should have been charged with truthfulness violations, but they were never misconstrued. What is misconstrued? You know, I think you've got to stay with this case. I am, Your Honor. You know, we're having very extended arguments in this case, and I just want to make sure you're keeping us on track. And if you're talking about other officers, how are you helping your case? How I'm helping the case, Your Honor, is giving you the evidence that the jury heard which allowed it to reach its conclusion on pretext. So the evidence is that the chief of police basically said that the real reason that he couldn't use Tinsley anymore was for truthfulness violations. And so I've shown you that the department undercut its articulated reasons with respect to truthfulness as it handled Amy Aquino, but there was also other evidence that credibility and truthfulness did not carry the weight that the chief tried to impress on the civil service board. And the jury heard that, and it reached the conclusion of pretext. And so we started Daphna's Grove talking about who is the same actor, and that's referenced in my brief. Once the jury gets all of this information, the question of whether Aquino was a comparator is a question of fact. The plaintiff has a burden on his prima facie case which is not honorable, and it is not a burden of persuasion. It is a burden of perception. Plaintiff's obligation for persuasion comes in at the pretext stage, and in this case, the jury found in plaintiff's favor on that pretext question. And there was ample evidence in this record upon which the jury could make that decision, and it is not for the court on appeal to second-guess the credibility determination. I don't think it's correct to say that the similarity and comparator is invariably a question of fact. We have cases all the time where judges say as a matter of law there's simply not enough similarity or there's not enough comparability here to make out a prima facie case. It's just like anything else. You bear the burden of creating an issue of triable fact with respect to similarity as you would with anything else, and the question is whether you carry your burden. That's what I meant, Your Honor, when I said the question of whether she was a comparator is a question of fact. I understand that there are cases where the courts used to make that determination, but my understanding of the issue on summary judgment is that with respect to any issues of fact, that those genuine issues of material fact and whether Ms. Aquino was a comparator, I think, is one of those genuine issues of material fact, and the case that I cite, Your Honor, I grant you there are two district courts obtained. One is Imani v. Bolden, which is out of the Eastern District of Virginia. It's a 2017 question, and it quoted a decision also out of the Eastern District of Virginia, which was a 2008 case, and I just want, Your Honor, to take a moment to say that the defendant relies upon the Mitchell case but does not say to the court that the Sixth has been clarified on the same supervisor requirement, and so in this case, because the chief of police claimed that he was the ultimate decision maker, he became the common denominator because he would be the ultimate decision maker with any employee who received rule violations based on recommendations from IA. The other thing that I would like to add to address a question that was raised by you, Judge Wilkerson, is that, or maybe it was a part of the argument from opposing counsel, she said that Mr. Tinsley only did well at what he wanted to do. The record does not support that at all. There's no such evidence in that. I want to also tell you that with respect to opinion, the opportunity for the department to hold her accountable to, for her behavior that was done while she was in uniform and on duty is evidence upon which a jury could do a comparative analysis and determine that he was treated differently under similar circumstances as Mr. Tinsley. Now, if all of this, to use your terms, Judge Wilkerson, mess with this allegation of race had not occurred, Mr. Tinsley would not have been at the point where he would have been terminated. And if the jury heard the chief of credibility and then saw all of this other evidence where credibility apparently did not matter that much because in those other cases, there was so much more egregious conduct, just flat out lying. You know, sometimes Mr. Tinsley was, for instance, accused of saying different things at different levels of the investigation. And I will tell the court that if you look at the record of the investigation and at the hearing, you will see that Mr. Tinsley denies raping Ms. Aquino. And he also answered the questions that were asked of him, different questions were asked of him at the, not the civil service, at the command chain, chain of command review board, then Sergeant Burke asked. Sergeant Burke testified that there are times when in the investigating, investigation of a complaint, they find that officers change their testimony. And it's up to them to decide whether they are going to charge them for doing so. His actual testimony was that sometimes a falsehood is not actionable, even though they know that it is false. And so I'm trying to impress upon you this very wide discretion that the internal affairs has to target people and to take action based on what they want to do, rather than to use the same standard with everybody. Now, the jury heard this evidence and they saw that Amy Aquino was given the benefit of the doubt, that the department took her allegations very seriously, but that when allegations were paid against her, not just by Mr. Tinsley, but by those women who were, who received a threatening phone whose job she showed up, now they didn't personally make the complaint, but they passed that information on to Mr. Tinsley who did, no action was taken against it. And I cannot believe that it is not equally offensive to the smooth and efficient operation of a police department to have a police officer make threatening phone calls to a citizen or to follow a citizen on her job for no law enforcement related reason. That cannot serve the interests of an efficient police department. Now, I believe that I heard a question about the amount of cut paid. I think Judge Wilkerson, you asked that and said that you wanted to have that address. I think it's been covered by both briefs. That's why I refrained from asking about it. Okay. All right. And so your honor, at this posture, I believe that the record evidence adequately supports the jury's verdict, adequately supports the judge's decision to deny the most brief trial. And we ask the court to affirm the decision in all respects, including the jury's verdict, the acceptable release, and the award of attorney's fees. I'll answer any other questions at the forefront. Thank you, Ms. Thompson. Ms. Keegan, you have some time as well. Yes, your honor. I'll just speak. We've been going a long time. Just briefly want to address the issue of the standard that came up. I would agree with your honor that this court could find as a matter of law there was not enough similarity between Aquino and Tinsley. And even if the court were to wish to decide it as a matter of fact, that likewise could occur. The court could decide that as a matter of fact that there was not enough similarity. And that is pursuant to Moore v. Charlotte, which is cited in my brief. Secondly, I want to bring up the fact that as much of our discussion today has been about looking at the evidence. And so we are, one of the And in ruling on a motion for a new trial, this court is permitted to weigh the evidence and consider credibility under Wyatt v. Interstate Ocean Transportation. So I just wanted to point that out. Ms. Sumter has brought up the fact, this notion that we did not, the city did not address complaints that were made against Aquino by Tinsley. And I would just want to briefly point out to the court that I believe the record before you speaks otherwise, specifically one of the things that is actually listed about Ms. Aquino is a memo that is in her file that is before you in the joint appendix. And it is a very specific memo at the joint appendix at 1350. It's a memo that was put in her file from Captain Harris dated 5-7-13. And it's very direct and it says effective immediately, you're given a direct order, you know, to stay away from the Central Division. And it lists out different things she is not to do. And it says we will meet to discuss this further. You know, if you have any questions, blah, blah, blah. But that was a direct result of a complaint made by Officer Tinsley. So that would certainly go against the notion that his complaints about Ms. Aquino that were made were ignored. Possibly there's testimony in the record that she was investigated? In that case, that was not a, it was just a direct order made to her to cease doing something at that level. Sorry? Investigate, internal investigation affairs deal with other complaints about stalking? So my knowledge of the testimony is that it was dealt with at the Division level. So he never had to go to Internal Affairs because it was he reported it to his investigated it. So that was what I was about to say, is that the testimony given was that different things are dealt with at different levels. In that regard, when he mentioned it to Sergeant Burke, he said, I've already reported this to my Division head. And I believe that is That's the problem with this case. I mean, first of all, you have to ignore some incredible decades of American history in this case. Decades in terms of context of this case. Because if you talk about comparatives, most of those cases you're talking about, they're dealing with performance of the job. Obviously, when you're dealing with comparatives, you have to have someone, a supervisor, or a department that's dealing with the same type of activities and performance and those things. That's not this case. And you have to close your eyes to the facts, if they otherwise. This case is about Internal Affairs dealing with conduct between these two people. It's not, you can bring up a record that represents 1989. It has nothing to do with it. It all falls in with this case. You can't talk to this person anymore. There's a question about whether he's been using because of what he did in terms of responding to this investigation. All this other stuff you talked about concerning something with absolute right had nothing to do with what the smoke and mirrors in terms of comparison. The comparison is how you dealt with the two of these people with this investigation about this situation. And they're uncommon. The same person did it, the investigation. And the chief was connected to that, and they were there. He didn't say anything about what he said. There's something that was wrong about the record. So all this stuff about all the records. And also, I can't believe you can ignore things that the whole person's done. They were never charged. We have cases all the time where people, one of the biggest problems with racial disparities is that sometimes other people don't get charged. That's why your record is so received, the charges. If that was the law, you'd be like, oh, no, no, no, it's no business. That's because you write me up for everything and write other people up for nothing. But that was the end of it. It says the amount of law research that you had compared it to. You had 29, and this person had three. That's because you haven't written them up. You haven't investigated this. That's the whole point. They're looking for him as an appellate court, an adversity jury, and a trial judge. He was weirdly the one who got the common sense of it, not necessarily his case. And the question is, did they really fire him because of the situation between the two of them and how they dealt with him physically? And that is, though, the factual question. There's no comparison based on how elaborate you are. But you would agree, no supervisor came up and testified about him being fired. This was all about the internal investigation. Let me answer this question, too, before I end. You tried the case, right? I did not. You did not. You didn't try. You were unlawful. But you were responsible. You're the only person who was unlawful. And didn't she say she ran it? Because the question was, how did she get her information just because I was running several places? Did she say she had run several places? In that testimony that the child police department put on in front of jury? I believe that she, my recollection was she'd run two places, but I cannot swear to you what she said. I don't recall it being said. All right. Are you aware that she's been in records of other interviews she made? I'm aware that she was disciplined for the same thing in terms of I know that she was disciplined for running a plate as well, just like he was. No, she had given an interview before the one you put in evidence. I'm aware of the fact that, yes. Yes, I'm aware that she spoke ahead of time. Right. Yes. So you're aware of that, right? Correct. You put in the one that was May 17th, but not the one that was earlier. That dealt with the whole question of how many places she ran. So I was not aware. That's what I think it is for in terms of, okay, if you have a license case in terms of the record, you are aware that she was given an interview with charges before the one that she put in. You put in the one May 17th. I'm not aware that there was, I mean, and I'm not aware that there was one that was omitted. I thought that Ms. Sumter wanted to hear. I didn't say omitted. I didn't say omitted. I didn't say omitted. That's your word. I said, I said you were aware that it existed. I didn't say that was omitted. You said it was omitted. I'm going to ask you, were you aware that it existed? I was aware there was an interview before, but I thought he had a conversation with her before they went on the record. And so I was not aware that anything was left out of the record like that. No, I was not aware of that. So, but in conclusion, if I can just finish up, I know my time is almost up, but we're just asking this court your honor to give consideration to the fact that there was not a proper comparator here and to also consider the fact that the awards of front and back pay are excessive under the circumstances and to take into consideration the fact that he was offered reinstatement and to likewise consider the issue of attorney fees as set forth in our brief. Thank you for your time. Excuse me, your honor, I know that I don't have to bottle, but I just listened to your question. Well, counsel, counsel, because you've gone so long, you'll have to do a 20-day letter if that's appropriate. Thank you, your honor, I can do that. Unless my colleagues can just allow, to allow it. And I assume it's something briefly about the record. Yeah, and it's not an argument. It's just that you, you are assuming that the way we're going to clear that up. Whatever you prefer. I'm perfectly willing, whatever you prefer chief is fine with me. Yes, certainly. The only point that I wanted to say is that your question assumes that the defendant entered those two recordings that you were talking about. Those were actually plaintiff's exhibits. Yes, that's all okay. Were both of them in the record? Yes, your honor. Okay, good. Okay, good. Thank you, Geraldine. Thank you for clearing that up. I think that, I think that helped you. Yeah, I appreciate that, Geraldine. Thank you. All right, counsel, we appreciate your arguments. You can come down and shake your hands. But know that we appreciate your good arguments and helpful in trying to understand difficult questions. And we appreciate it and we hope that you will be safe and stay well. Thank you very much. The court will take a brief break before hearing the next case.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Barbara Milano Keenan